Peter Strojnik, (006464)
Strojnik P.C.
1 East Washington St.
Suite 500
Phoenix, AZ 85004

Fabian Zazueta, (032687)
Advocates for Individuals with Disabilities
40 North Central Ave
Suite 1400
Phoenix, AZ 85004
Telephone:    (774) 768-2233
fabian@aid.org
760WRayRd@aadi.org
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Advocates for Individuals with Disabilities LLC, and David Ritzenthaler,<br><br>Plaintiffs,<br>v.<br><br>MidFirst Bank,<br><br>Defendant. | Case No: 2:16cv-01969-PHX-NVW<br><br>**PLAINTIFF'S RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE** |

Pursuant to the Court's Order (Doc. 26), Respondents Peter Strojnik and Fabian Zazueta, with the assistance of ethics counsel Mark Harrison, Geoff Sturr, and Josh Bendor from the law firm of Osborn Maledon, P.A., submit the following memorandum. Part I provides written responses to the factual questions posed by the Court, which Respondents will be prepared to discuss more fully at the scheduled December 12 hearing. Part II provides the memorandum of law the Court has requested.

**I.   Preliminary Response to Court's Factual Questions**

As a preliminary matter, Respondents note that page 2 of the Court's Order referenced a news report concerning Mr. Strojnik's standard opening offer in settlement negotiations. The offer is just that – an opening offer that forms the basis for negotiation – and as set forth below,

Mr. Strojnik's client, Advocates for Individuals with Disabilities, LLC ("AID") has reached negotiated settlements of various amounts, with the average settlement being approximately $3,400.

**1.   Did Mr. Strojnik make a pre-suit demand on Defendant in this case?**

This action was filed in state court on May 17, 2016. AID did not make a pre-suit demand, because the ADA does not require one. *See Skaff v Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 845 (9th Cir. 2007) ("ADA plaintiffs are not required to provide pre-suit notice to defendants."). Indeed, the Ninth Circuit has held that "failing to provide prelitigation notice cannot, by itself, be considered harassing or improper because the ADA permits the conduct." *Jankey v. Poop Deck*, 537 F.3d 1122, 1131 (9th Cir. 2008) (holding that a district court could not deny a fee award under the ADA based on a conclusion that a lack of prelitigation notice was unjust).

**2.   Has Mr. Strojnik generally not given pre-suit demands before filing actions of this nature? If he has general given pre-suit demand, what have they been? What is the approximate percentage of cases of this nature in which Mr. Strojnik has not given pre-suit demand?**

Before June 2016, AID had not made pre-suit demands before filing actions seeking to enforce compliance with the Americans With Disabilities Act ("ADA") and the Arizonans With Disabilities Act ("AzDA"). In early June, AID elected to do so to further encourage remediation.

On or about June 15, 2016, AID mailed out 39,375 notices to public accommodations across Maricopa County (hereinafter, the "Pre-Inspection Letter"). *See* Exhibit A, Pre-Inspection Letter. The Pre-Inspection Letter informed public accommodations that AID would soon conduct inspections of exterior ADA barriers and provided detailed information on how to remediate problems with the exterior barriers that would be the focus of AID's inspection. *Id*. The Pre-Inspection Letter was not presented in a form of a pre-suit demand. *Id.* AID incurred approximately $20,000 to send the letters.

In addition to the Pre-Inspection Letters, between the approximate dates of June 15, 2016 and July 1, 2016, AID mailed out 789 post-inspection letters informing public accommodations of exterior violations AID agents identified upon inspection of their parking lots. *See* Exhibit B, Post-Inspection Letter. AID informed the recipients that if they remediated the identified violations and provided proof of remediation, it would not file suit. *Id*. AID received contact from 281 (35%) of the business and did not file suit against them, or, alternatively, dismissed with prejudice any pending litigation.

AID's records reflect that it has sent Pre-Inspection Letters to 51% of defendants; Post-Inspection Letters to 24% of defendants; and no warning to 25% of defendants.

Furthermore, AID has also sought to encourage compliance with the ADA by publishing guidelines such as the following press release:

> After checking over 2,500 businesses, AID.org found less than 200 businesses had parking lots compliant in the areas violations are being noted. That is just over 5% of businesses with parking lots that are accessible to those with disabilities
>
> Today, we want to inform business owners of 3 simple potential and common violations which they can quickly check for and easily correct in order to assure that they are one step closer to full ADA compliance.
>
> Proximity. ADA compliant designated Accessible Parking spaces are to be the closest parking spaces to the entrance.
>
> Signage. Each ADA compliant Accessible Parking space must be properly marked, using reflective paint and signage, with the international symbol of accessibility and a minimum of 60 inches from the ground to the bottom of the sign.
>
> Van Accessible. Each parking facility must include at least one Van Accessible Parking space and must be labeled as "Van Accessible" and also be the correct size to allow for a van to load and unload passengers.
>
> Here are three great steps in the right direction to ADA compliance. To find out if your business is following the letter of the law visit ADA.gov.

**3.    Has Mr. Strojnik generally demanded some amount of money to dismiss cases of this nature, regardless of the defendant's immediate remediation and of variations of actual time spent on each case? If so, what has that amount been?**

In cases in which a property owner responded to a pre-suit demand letter or notice by providing evidence that ADA and AzDA violations had been corrected, AID did not make any demand for payment to conclude the matter. In all other matters, AID has sought to negotiate a settlement providing for (1) full inspection by the place of public accommodation and agreement to fully comply with all guidelines of the ADA, and (2) a monetary payment to compensate AID (and any other plaintiffs) for its costs, fees, expenses, and damages. Although AID has a standard opening offer, the amount agreed to by the parties in particular negotiations has varied depending on factors such as whether the business owner has promptly acknowledged and remedied non-compliance and the effort AID has had to expend. The average settlement to date is approximately $3,400. The aggregate amounts received in settlement are less than AID's expenditures to date on filing fees and service of process, not to mention its much larger inspection costs, investigation expenses, and attorney's fees.

**II.    Memorandum of Law**

Respondents hereby respond to the questions of law posed by the Court.

**1.    Whether it violates the Arizona Rules of Professional Conduct in a fee recovery case to demand payment of attorneys fees from an opposing party that are unreasonably high?**

Demands for attorneys fee made in pleadings are governed by ER 3.1, which provides, in relevant part, that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a good faith basis in law and fact for doing so that is not frivolous, which may include a good faith modification or reversal of existing law."  Hypothetically, a pleading could violate ER 3.1 if it demanded much more in attorneys' fees than the lawyer would reasonably incur in obtaining a judgment.

Here, the state court complaint sought a judgment that would include, alternatively, "payment of costs of suit, expenses and attorney's fees," or "payment of attorneys' fees pursuant

to 42 U.S.C. § 12205, 28 CFR § 36.505 and other principles of law and equity and in compliance with the 'prevailing party' and 'material alteration of the parties relationship' doctrines [as applicable to ADA cases, *see Coppi v. City of Dana Point,* Case No. SACV 11-1813 JGB (RNBx) (February, 2015)] in an amount no less than $5,000.00." Prayer for Relief, Subparagraphs (c) and (d).

Respondents respectfully submit that they did not violate ER 3.1 because AID's demand for attorneys' fees of not less than $5,000 was well grounded in fact and made in good faith. AID would likely incur much more than $5,000 in fees if the matter proceeded to judgment. In addition, any fee award would be at the discretion of the court.

Demands made during settlement negotiations are governed by ER 4.1, which provides in relevant part that "[i]n the course of representing a client a lawyer shall not knowingly . . . make a false statement of material fact or law to a third person." Comment 2 to the Rule, which discusses its application in negotiations, states in relevant part:

> This Rule refers to statements of fact. Whether a particular statement should be regarded as one of fact can depend on the circumstances. Under generally accepted conventions in negotiation, certain types of statements ordinarily are not taken as statements of material fact. Estimates of price or value placed on the subject of a transaction and a party's intentions as to an acceptable settlement claim are ordinarily in this category, and so is the existence of an undisclosed principal except where nondisclosure of the principal would constitute fraud.

Thus, a lawyer might violate ER 4.1 if, during negotiations, he falsely claimed to have incurred a specific amount of attorneys' fees, but he would not violate ER 4.1 merely by making an offer of settlement that includes fees higher than those actually incurred.

Here, Respondents respectfully submit that they did not violate ER 4.1. The settlement offers made in this case, and in all similar cases, were offered for purposes of initiating or sustaining negotiations that would result in a settlement. No representations were made as to the amount of attorneys' fees incurred. Any initial lump-sum demands were nothing more than an opening offering, to which an opposing counsel could respond with a lower counter-offer. Many cases have been settled for reasonable amounts and proof that the ADA and AzDA violations at issue have been corrected.

**2.     Whether it violates the Arizona Rules of Professional Conduct to charge a client attorney fees for litigation services in an action that could have been resolved by a request and without a lawsuit.**

The reasonableness of attorneys' fees is governed by ER 1.5(a), which states, in part, that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." The Rule sets forth "factors to be considered in determining the reasonableness of a fee." A lawyer is obligated, at the conclusion of a representation, to determine whether, in light of those factors, the fee charged was reasonable. *See In re Swartz*, 141 Ariz. 266, 273, 686 P.2d 1236, 1243 (1984). Hypothetically, a lawyer who charges a client a significantly higher amount for providing litigation services, in a matter where it is certain that the attorney could have resolved the matter for a much lower fee without filing a lawsuit, could be found to have violated ER 1.5 by charging an unreasonable fee.

Here, Respondents respectfully submit that Mr. Strojnik did not violate ER 1.5 in that he has never charged his jointly represented clients, AID and David Ritzenthaler, an unreasonable fee. His fee agreement with them provides for a flat-fee of $5,000, payable only upon obtaining a recovery. Some of these cases are more expensive to litigate, while others resolve at little cost. In particular cases, Mr. Strojnik has reduced his fee to account for the circumstances under which the case was resolved. He donates all fees he receives to AID.

**3.     Whether it violates the Arizona Rules of Professional Conduct in a fee recovery case to demand payment from an opposing party of attorney fees for litigation services in an action that could have been resolved by a request and without a lawsuit.**

Respondents are not aware of any provision of the Arizona Rules of Professional Conduct which require an attorney to make a pre-suit demand before initiating on a client's behalf a lawsuit in which the client may recover attorneys' fees when the underlying cause of action does not require that such a demand be made. As discussed above, a lawyer's demand for the payment of attorneys' fees is governed by ERs 3.1 and 4.1. As also set forth above, Respondents believe they have complied with those Rules.

**4.      All Arizona cases allowing litigation to proceed without party standing.**

Respondents do not contend that Arizona has no requirement of standing. However, unlike more rigid Article III requirements, Arizona law affords trial courts discretion when addressing standing:

> We have previously determined that the question of standing in Arizona is not a constitutional mandate since we have no counterpart to the "case or controversy" requirement of the federal constitution. In addressing the question of standing, therefore, we are confronted only with questions of prudential or judicial restraint. We impose that restraint to insure that our courts do not issue mere advisory opinions, that the case is not moot and that the issues will be fully developed by true adversaries. Our court of appeals has explained that these considerations require at a minimum that each party possess an interest in the outcome. Thus, the question of standing in Arizona cases such as this need not be determined by rigid adherence to the three-prong [federal test], although those factors may be considered.

*Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs. in Arizona*, 712 P.2d 914, 919 (Ariz. 1985) (internal citations omitted); *see also Bennett v. Brownlow*, 119 P.3d 460, 462 (Ariz. 2005) (standing can be waived by Arizona courts in rare circumstances). Given these "more flexible standing requirements of Arizona law," Respondents have argued, and will argue that they have standing in Arizona state courts.

Moreover, The language of the AzDA is clear and unambiguous. It states, in relevant part:

> **Any person** who believes that any covered person or entity has engaged in, or that there are reasonable grounds to believe that any covered person or entity is about to engage in, any act or practice prohibited by sections 41-1492.01 through 41-1492.05 …may institute a civil action for preventive or mandatory relief, including an application for a permanent or temporary injunction, restraining order or other order.

A.R.S. § 41-1492.08(A)(emphasis added).

**5.      Any reason why it is not absolutely certain that under Arizona law this action would not be allowed to proceed without injury and standing.**

The removal statute provides that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction [over a case removed from state court], the case shall be remanded." 28 U.S.C.A. § 1447(c). This applies to cases that lack standing. *Polo v.*

7

*Innoventions Int'l, LLC*, No. 14-55916, 2016 WL 4394586, at *3 (9th Cir. Aug. 18, 2016) ("a removed case in which the plaintiff lacks Article III standing **must** be remanded to state court under § 1447(c)")(emphasis added).[1]

The only instance where this Court could dismiss without remand is in an instance "where there is absolute certainty that remand would prove futile." *Bell v. City of Kellogg*, 922 F.2d 1418, 1425 (9th Cir. 1991). However, the Supreme court has cast doubt on this possible course of action, noting that the literal words of §1447(c), on their face, give no discretion to dismiss rather than remand an action. *Int'l Primate Prot. League v. Administrators of Tulane Educ. Fund*, 500 U.S. 72, 89 (1991) (citing *Main Assn.of Interdependent Neighborhoods v. Commissioner, Main Dept. of Human Services,* 876 F.2d 1051, 1054 (1st Cir. 1989).

Here, there is a strong likelihood that Plaintiff's claims will survive any jurisdictional challenge in Arizona State Courts. Plaintiffs satisfy the plain statutory requirement of "any person," Plaintiffs and Defendant are true adversaries with legitimate legal interests, and a state court ruling on the matter would not be merely advisory. *See Armory Park*. Of note, Plaintiffs' claims have survived prior standing challenges. *See* Exhibit C (Order denying defendant's motion to dismiss based on standing).[2] The determination of standing should be left to the Arizona State Court because it is not absolutely certain that remand would be futile.

/ / /

/ / /

/ / /

---

[1] Notably, federal judges in this district have consistently held remand is the appropriate disposition for Plaintiff(s) enforcement actions. *See Advocates for Individuals with Disabilities Foundation Incorporated v. Superstition Springs, LLC, CV-16-02298-PHX-GMS, Advocates for Individuals with Disabilities Foundation Incorporated v. Golden Rule Properties, LLC, CV-16-02413-PHX-GMS,Advocates for American Disabled Individuals, LLC v. The Price Company, CV-16-02141-PHX-GMS*; *Advocates for Individuals with Disabilities, LLC, et al. v. WSA Properties, LLC, CV-16-02375-PHX-DGC; Advocates for Individuals with Disabilities, LLC, v. Smith Food & Drug Centers, Inc.CV-16-01586-PHX-JTT; Advocates for Individuals with Disabilities Foundation, Inc. v. Dillon Real Estate Co., Inc., CV-16-02781-PHX-SOB; Advocates for Individuals with Disabilities Foundation, Inc., CV-16-02770-PHX-SPL; Advocates for Individuals with Disabilities, LLC, v. International Restaurants II, LLC, CV-16-01923-PHX-DKD.*

[2] While Arizona State Courts have ruled in Plaintiff's favor based on standing like the attached Exhibit A, other courts have ruled to the contrary. *See CV2016-004584* and *CV2016-090503 (with Appeal pending)*.

**RESPECTFULLY SUBMITTED** this December 7, 2016.

**STROJNIK P.C.**

By: _____
Peter Strojnik, Esq.
Attorney for Plaintiffs


**ADVOCATES FOR INDIVIDUALS WITH DISABILITIES FOUNDATION**

By: */s/Fabian Zazueta*
Fabian Zazueta, Esq.
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2016, I electronically transmitted the attached document using the CM/ECF system for filing, and which will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.